IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KATHLEEN L. PHELPS, Individually, and as Administratrix of the Estate of ANTHONY O. PHELPS, MARK S. PHELPS, MATTHEW A. PHELPS and MEGHAN PHELPS BUEHLER | §<br>§<br>§<br>§<br>§<br>§<br>§ | No. 500, 2017D |
| Plaintiff Below, Appellants, | §<br>§<br>§ | Court Below – Superior Court of the State of Delaware |
| v. | §<br>§<br>§ | |
| DR. JOSEPH T. WEST, CARDIOLOGY CONSULTANTS, P.A., and CHRISTIANA CARE HEALTH SYSTEM, INC., | §<br>§<br>§<br>§<br>§<br>§ | C.A. No. N15C-12-136 |
| Defendants Below, Appellees. | §<br>§<br>§ | |

Submitted:  August 15, 2018
Decided:  August 16, 2018

Before **STRINE**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

## **O R D E R**

This 16th day of August 2018, upon consideration of the briefs and record on appeal, it appears to the Court that:

(1)     Kathleen Phelps and her children (the "Plaintiffs") sued Dr. Joseph T. West, Cardiology Consultants, P.A., and Christiana Care Health System, Inc. ("Defendants") for medical negligence during Dr. West's treatment of Anthony Phelps, who was Kathleen's husband and the children's father.  Plaintiffs allege that, after Dr. West performed a catheterization on Mr. Phelps on August 22, 2014, Dr. West failed to recommend that Mr.

Phelps remain hospitalized to undergo immediate surgery—a decision that they contend led to Mr. Phelps's death. They seek damages.

(2)     On November 14, 2017, following a multi-day trial in the Superior Court that began on November 6, 2017, the jury found Defendants not liable. The jury awarded no damages. Plaintiffs appeal that verdict and an earlier, November 9, 2017 bench ruling issued during trial that overruled Plaintiffs' objection to the testimony of one of Defendants' experts. Plaintiffs allege that this testimony was not fairly disclosed in conformance with Superior Court Civil Rules 16(e) and 26(e) ahead of trial and violated their right to a fair trial.

(3)     More specifically, Plaintiffs assert two arguments on appeal.

(4)     First, they allege that the Superior Court abused its discretion in declining to preclude the disputed expert testimony.

(5)     Second, they allege that the Superior Court's failure to preclude this testimony "rendered the expert witness disclosure requirements of Superior Court Civil Rules 16(e) and 26(e) meaningless."[1]

(6)     Rule 16(e) provides:

> *Pretrial Orders.* After any conference held pursuant to this Rule, an order shall be entered reciting the action taken. This order shall control the subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice.[2]

---

[1] Plaintiffs' Opening Br. at i.

[2] Del. Super. Ct. Civ. R. 16(e).

2

(7)     Rule 26(e) provides:

*(e) Supplementation of Responses.*  A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement the response to include information thereafter acquired except as follows:

(1) A party is under a duty seasonably to supplement the response with respect to any question directly addressed to (A) the identity and location of persons having knowledge of discoverable matters, and (B) *the identity of each person expected to be called as an expert witness at trial, the subject matter on which the person is expected to testify, and the substance of the person's testimony.*[3]

(8)     For the reasons set forth below, we reject Plaintiffs' arguments and AFFIRM the Superior Court's November 9, 2017 bench ruling and the subsequent jury verdict in Defendants' favor.

\* \* \*

(9)     This case arises out of a tragic course of events.  Following the referral of Mr. Phelps' regular cardiologist, defendant Dr. West performed a catheterization on Mr. Phelps on August 22, 2014.  Dr. West discovered that three of Mr. Phelps' coronary arteries were blocked, including 95% of the right coronary artery.  Dr. West diagnosed Mr. Phelps with multi-level coronary artery disease and determined that he needed to undergo coronary artery bypass graft (CABG) surgery.[4]  Dr. West then advised Mr. Phelps of at least some of the various risks and benefits associated with discharge, as well as the

---

[3] Del. Super. Ct. Civ. R. 26(e) (emphasis added).

[4] Plaintiffs' Exhibit 13, Diagnostic Cardiac Catheterization Report for Anthony Owen Phelps (Aug. 22, 2014), at A119-21.

3

alternatives to leaving the hospital.[5] Dr. West then referred Mr. Phelps to a cardiac surgeon and discharged him from the hospital.[6] Following Mr. Phelps' release, Dr. West was no longer involved in Mr. Phelps' care or treatment.

(10) On August 29, 2014, Mr. Phelps met with the surgeon, Dr. Paul Davis, who agreed with Dr. West that Mr. Phelps should undergo CABG surgery. They scheduled the procedure for September 11, 2014.[7]

(11) However, days before the scheduled surgery, Mr. Phelps contracted bronchitis. He alerted Dr. Davis's office on September 8, 2014, and they rescheduled the surgery for September 25, 2014. On September 18, 2014, they again had to reschedule the surgery—this time because of the operating room schedule. The surgery was pushed back to October 1.

(12) But, on September 19, 2014, before the surgery could be performed, Mr. Phelps developed an acute myocardial infarction (MI) and went into cardiac arrest.[8] He died the following day, September 20, 2014.[9]

---

[5] Pretrial Stipulations signed by Court (Oct. 23, 2017), at B147 [hereinafter Pretrial Stipulations].

[6] Discharge Instructions for Anthony Owen Phelps (Aug. 22, 2014), at B7.

[7] Exhibit 5 of the Deposition Transcript of Christine Brady, Christiana Care Cardiac Surgery Chart Notes for Anthony Phelps, at A73. The dates on the chart are for the year 2015 instead of 2014. The parties do not explain this discrepancy in the record before us, and thus we assume that the chart meant to indicate 2014 as the year of the events in question given that Mr. Phelps passed away in 2014.

[8] Plaintiffs' Exhibit 16, Christiana Care Discharge Summary for Anthony Owen Phelps, at A74.

[9] *Id*. at A74-75.

4

(13)   Plaintiffs filed this suit on December 15, 2015, and alleged, among other things, that Dr. West was negligent in discharging Mr. Phelps prior to surgery and failing to inform him of the risks of leaving the hospital.

(14)   Consistent with these allegations, Plaintiffs disclosed before trial that their only expert, Dr. Randall Zusman, would assert that Dr. West violated the applicable standards of care in two ways: (1) failing to recommend that Mr. Phelps be admitted to the hospital for surgery immediately following the cardiac catheterization, and (2) "failing to inform Anthony Phelps of the reasons to remain in the hospital and the risks of leaving the hospital."[10]

(15)   The second theory, the "informed consent" theory, is relevant here, given that Plaintiffs argue on appeal that the trial court abused its discretion in permitting testimony on this theory because Defendants' expert disclosures allegedly failed to disclose their expert's plan to testify on this issue.

(16)   Regarding Plaintiffs' "informed consent" theory, Plaintiffs' expert disclosure stated that its expert would testify that "Dr. West should not have informed Anthony Phelps that he would not have received any treatment if he remained in the hospital over the weekend. Providing such misinformation would have encouraged Mr. Phelps not to remain in the hospital."[11]

---

[10] Plaintiffs' Expert Disclosure, at A99-101. Accordingly, Dr. Zusman later testified at trial that Dr. West "had an obligation . . . to fully discuss the risks and benefits of all of the options for Mr. Phelps before Mr. Phelps made what, in this case, was an uninformed decision to leave the hospital." Randall Zusman Trial Testimony Transcript (Nov. 9, 2017), at B294-95.

[11] Plaintiffs' Expert Disclosure, at A100.

(17) Plaintiffs' expert disclosure listed several omissions that allegedly undermined Dr. West's compliance with the informed-consent standard of care. It asserts that Dr. West should have told Mr. Phelps the following information:

a. If [Mr. Phelps] remained in the hospital, he would have been treated as a priority patient. He could have been evaluated over the weekend and surgery would have been performed before leaving the hospital.

b. If he left the hospital before surgery, he was at imminent risk of death.

c. If he left the hospital, surgery could be delayed due to unforeseen factors, such as the development of other medical problems, the unavailability of a surgeon, etc.

d. If he left the hospital, his activity level could not be monitored.

e. If he left the hospital and suffered a M.I., immediate treatment options would not be available to him.[12]

(18) In turn, in addition to Dr. West, Defendants identified two experts in their disclosure documents, Dr. Michael Fifer and Dr. Peter Smith.[13] Defendants' disclosures noted that Dr. Fifer, the Director of the Cardiac Cath Lab and Professor at Harvard Medical School, "may address and/or rebut any testimony provided by Plaintiffs' experts."[14] In addition, beginning on page 2, Defendants provided the following information concerning Dr. Fifer's anticipated testimony:

> It is expected that Dr. Fifer will testify with regard to the issues of standard of care and causation. It is Dr. Fifer's opinion that Dr. West complied with the applicable standards of care at all times hereto. It

---

[12] *Id.* at A100-101.

[13] Defendants' Expert Disclosure, at A102, A105, A108.

[14] *Id.* at A103.

6

is further his opinion that no alleged negligent act by Dr. West caused or contributed to Plaintiffs' claimed injuries.

Specifically, it is Dr. Fifer's opinion that Dr. West acted appropriately in discharging Mr. Phelps on August 22, 2014. In particular, Dr. Fifer believes that it was reasonable for Dr. West to discharge Mr. Phelps after his diagnostic catheterization based on the findings during the catheterization and Mr. Phelps' clinical scenario. At all times during Dr. West's treatment of Mr. Phelps on August 22, 2014, Mr. Phelps had stable angina and did not report any complaints of ongoing chest pain at rest, ongoing shortness of breath at rest, or other potential symptoms indicating unstable angina. In other words, Mr. Phelps presented with stable angina. The catheterization films likewise do not show anything that would indicate that Mr. Phelps needed emergent surgery. Moreover, the discovery to date indicates that Dr. West had no reason to suspect that Mr. Phelps had unstable angina at any prior time. Dr. West also ordered a surgical consult, and Mr. Phelps was seen on August 22, 2014 by a cardiac surgery physician assistant before Mr. Phelps was discharged. Because Mr. Phelps had stable angina, Dr. Fifer believes that it was reasonable to discharge a patient like Mr. Phelps to his primary cardiologist and recommend that he undergo cardiac surgery, rather than order emergent surgery or keep Mr. Phelps in the hospital.

Dr. Fifer will further testify that, based on the discovery to date, Mr. Phelps understood the need to recognize any chest pain symptoms and immediately report to the emergency room if those occurred. Moreover, the discovery to date indicates that Mr. Phelps did not have any periods of unstable angina or complaints of chest pain at rest that were reported to his treating physicians, including Dr. West, at any point between August 22, 2014 and September 19, 2014.

Dr. Fifer will also opine that it is not the standard of care to keep patients in the hospital when they have stable angina. Keeping a patient in the hospital for potential elective surgery days later would not be appropriate to the patient, would generate needless costs, and could risk hospital acquired infections to the patient. Moreover, it would not be inappropriate to tell a patient like Mr. Phelps that he would not likely have elective cardiac surgery over the weekend.

Dr. Fifer will opine that, if Mr. Phelps developed chest pain on September 19, 2014 approximately 3-4 hours before he collapsed, and if Mr. Phelps had presented to the Emergency Room when those

7

symptoms began, Mr. Phelps more likely than not would have been taken to the catheterization lab. In the catheterization lab, it is more likely than not that Mr. Phelps' right coronary artery would have been reopened with stenting procedures. Had that occurred, Mr. Phelps would have survived his heart attack.[15]

(19) At his subsequent deposition, Dr. Fifer further testified that the disclosures accurately reflected his views, but that they featured only "some" of his opinions.[16] After prompting by Plaintiffs' counsel, Dr. Fifer explained how he would approach discussing treatment options with a patient in Mr. Phelps' situation prior to a possible discharge:

> Well, you know, if it's Thursday afternoon and the surgeon says I'll do this tomorrow morning, I would give the patient that option. I would say you can either have it done tomorrow if you're ready psychologically or you can go home and come back. But there's nothing about Mr. Phelps' clinical presentation or the catheterization that would make me instruct him to stay in the hospital.[17]

(20) Plaintiffs' attorney followed up by asking Dr. Fifer why he would have given the patient the "option of staying in the hospital and having the surgery performed the next day," and Dr. Fifer responded "[f]or his convenience."[18] He stated that he subscribed to "the principle of patient autonomy: If there are options, you give the patient the choice."[19]

(21) Plaintiffs' counsel also asked Dr. Fifer whether a treating physician should inform the patient that indigestion could be a sign of ischemia, and Dr. Fifer responded:

---

[15] *Id.* at A103-05.

[16] Michael Fifer Deposition Transcript (June 30, 2017), at B23-24 [hereinafter Fifer Depo Tr.].

[17] *Id.* at B44.

[18] *Id.* at B45.

[19] *Id.*

8

I don't think it's something that a doctor would be required to inform the patient of. There are many, many things we can tell patients, I can't think of all of them. I don't think that's one of the things that would come to mind.[20]

(22) Dr. Fifer additionally testified that he does "[n]ot necessarily" tell all patients that he discharges from the hospital following a cardiac catheterization that they should report to the hospital if they experience angina, but he submitted that he might do so "[d]epend[ing] on the patient," as his evaluation "depends on many, many factors," and "too many variables" that he "couldn't generalize."[21]

(23) Plaintiffs objected before trial to expert testimony on informed consent "absent the disclosure of such expert opinion," as noted in the parties' joint pretrial stipulation.[22]

(24) At the pretrial conference, on October 23, 2017, the Superior Court heard oral argument on the admissibility of testimony concerning informed consent. Defendants highlighted the pertinent statements in their disclosure documents and elicited during Dr. Fifer's deposition testimony and argued that these statements show that Plaintiffs were on notice that Dr. Fifer would testify as to whether Dr. West had complied with the informed-consent standard of care.[23] The trial court agreed with Plaintiffs that "to the extent an

---

[20] *Id.* at B49.

[21] *Id.*

[22] Pretrial Stipulations, *supra* note 5, at B149.

[23] Pretrial Conference Transcript (Oct. 23, 2017), at B96-97 [hereinafter Pretrial Conf. Tr.] (Defendants' Counsel: "[I]n the disclosure it is referenced that Dr. Fifer will discuss the recommendation for surgery rather than keep him in; that's at the bottom of paragraph one [on page 3]. Paragraph two talks about how the patient understood the need to recognize his symptoms

9

opinion is not disclosed in an expert disclosure it is not - - it's not admissible in evidence," but nonetheless also agreed with the Defendants that they identified language in the disclosure document and Dr. Fifer's deposition testimony that "at least go[es] to some of the issues in the informed consent issue."[24] The trial court summarized:

> [T]o the extent Dr. Fifer is testifying as to those particular opinions that he has disclosed, I think that's fair game and he's entitled to testify about it. If the testimony starts to stray beyond those particular issues, then certainly you can raise an objection, Mr. Roseman [Plaintiffs' counsel]. Unless it's within the expert disclosure that the defendant's [sic] provided, the testimony's not admissible.[25]

(25) At trial, after Defendants' attorney asked Dr. Fifer whether Dr. West violated the standard of care by failing to warn Mr. Phelps that "he had certain risks and complications if he didn't stay in the hospital,"[26] Plaintiffs objected. They argued that defense counsel was trying to elicit testimony on informed consent that had not been properly disclosed prior to trial pursuant to Superior Court Civil Rules 16(e) and 26(e).

(26) Defendants again pointed to the aforementioned excerpts from Dr. Fifer's disclosures and deposition testimony and asserted that they cover Dr. Fifer's opinions concerning the conversation that a doctor should have with his patient prior to discharge from the hospital in these circumstances. Defendants argued that pretrial expert disclosures

---

and report to the emergency room. And the third paragraph, the bottom says: 'Moreover, it would not be inappropriate to tell a patient like Mr. Phelps that he would not likely have elective cardiac surgery over the weekend,' which obviously addresses what Mr. Phelps was told and what's appropriate.") (also referencing statements in Dr. Fifer's deposition testimony).

[24] *Id.* at B99-100.

[25] *Id.* at B100.

[26] Jury Trial Transcript (Nov. 9, 2017), at B361 [hereinafter Trial Tr.].

10

need not include "magic words" such as "informed consent" in order for the court to allow the expert to testify on a given subject such as informed consent.[27]

(27) The trial court overruled Plaintiffs' objection. The judge agreed with Defendants that they had "fairly disclosed that [Dr. Fifer] intended to offer a decision as to the standard of care as to informed consent."[28]

(28) Describing the decision as a "close call," the trial judge listed several reasons for her conclusion that the pretrial disclosures adequately disclosed Dr. Fifer's intended opinion testimony:

> On page two, second paragraph, second sentence, the disclosure states: 'It is Dr. Fifer's opinion that Dr. West complied with the applicable standards,' plural, 'of care at all times hereto. It is further his opinion that no alleged negligent act by Dr. West caused or contributed to Plaintiff's claimed injuries.'
>
> In the context of this case and with all the parties knowing that there were two different standards of care in issue, and the fact that standards is used in plural sense, to be distinguished from Dr. Smith's disclosure which only is the standard in the singular sense, coupled with the fact that Defendants also disclosed on page eight of the disclosure that all of the experts were expected to rebut the opinions put forth in the same or similar field by Plaintiffs' experts, and the fact that the disclosure at page three refers, though somewhat obliquely, to what it would be appropriate to tell a patient like Mr. Phelps regarding both the possibility of hospital infections and the likelihood of having surgery over the weekend, and coupled with the fact that there was at least some deposition testimony regarding what the risks and benefits of discharge were, giving a patient the option to stay in the hospital and disclosing to a patient or advising a patient regarding certain symptoms and whether they should be flagged for a patient, all of that, again, though borderline, I think, and in view of the fact that this was not raised in a *Daubert* Motion or in a motion *in limine*, which I think

---

[27] *Id.* at B365-69.

[28] *Id.* at B372.

would have been the more appropriate – or, frankly, in a motion for summary judgment if the Plaintiffs believed that the Defendants had put forth no expert opinion as to informed consent, and at this late date, precluding the doctor from testifying would leave the Defendants without any expert testimony other than Dr. West, who is the Defendant, regarding the issue of informed consent, balancing all of those factors, the objection to the doctor's testimony regarding the standard of care for informed consent is overruled.[29]

(29)    Dr. Fifer then testified at trial that Dr. West had complied with the applicable

standards of care.  Defendants' counsel resumed questioning as follows:

> Q:    Did you understand that the Plaintiffs' two allegations concerning Dr. West, one is that he should have kept Mr. Phelps in the hospital when he did his cath; and two, that he should have given him certain information concerning the risks of him leaving the hospital.  Do you understand that?
>
> A:    Yes.
>
> Q:    And in this case, did you reach an opinion on those issues, after you have reviewed all of the records and the depositions, on those questions?
>
> A:    Yes.
>
> Q:    Briefly, what is your opinion as to those two?
>
> A:    My opinion is that there was no requirements [sic] to keep the patient in the hospital and that Dr. West fulfilled all of the standards of care requirements.
>
> Q:    Do you hold those opinions to the degree of reasonable medical probability?
>
> A:    Yes."[30]

---

[29] *Id.* at B372-74.

[30] *Id.* at B376-77.

(30)    He testified that a physician need not warn a patient that indigestion might be a sign of angina.[31]  He also testified that a physician need not warn a patient in Mr. Phelps' situation that he could die from an MI if he were discharged,[32] and that his risk of dying was less than 1%.[33]  Dr. Fifer also testified that the standard of care does not require a physician to tell a patient that he had the option of staying in the hospital.[34]

(31)    Following trial, the special verdict form asked the following question, among others:

> Do you find that the defendant, Joseph T. West, breached the standard of care by failing to obtain informed consent from Anthony O. Phelps during his treatment of him?[35]

(32)    The jury answered "No."[36]

* * *

---

[31] *Id.* at B420 (Q. "Because indigestion can be considered an angina equivalent, did Dr. Schaeffer or Dr. Grubbs have a duty to tell Mr. Phelps, you better watch out, if you have indigestion symptoms, you need to go to the hospital?"  A. "You know, I don't think there's a requirement for a doctor to say that.").

[32] *Id.* at B434 (Q. "Based upon the cath images that you have reviewed, based upon the clinical information that you have seen from Dr. Grubbs's H&P, did standard of care require that Mr. Phelps be told that he could die of an MI if he went home?"  A. "No.  That's not what we generally do.").

[33] *Id.* at B436 (Q. "Based upon the cath report and everything else that Dr. West knew of Mr. Phelps, and based upon your education and experience, if Mr. Phelps had asked, what is the change that I'm going to die if I go home, what would he be told?"  A. "I would say it's less than one percent.").

[34] *Id.* (Q. "Was offering the patient the choice of staying in the hospital for surgery the next day or whatever, under this scenario, required under the standard of care?"  A. "No.").

[35] Special Verdict Sheet (Nov. 14, 2017), at A70.

[36] *Id.*

13

(33)    Plaintiffs frame their arguments on appeal somewhat awkwardly, but the core of their argument is that the Superior Court abused its discretion—and violated the spirit of Rules 16(e) and 26(e)—by allowing Dr. Fifer's testimony on informed consent, and that that decision by the trial court should be reversed and a new trial granted because the admission of such testimony denied Plaintiffs a fair trial.

(34)    The parties agree that our standard of review when reviewing a Superior Court decision to admit certain evidence is "abuse of discretion."  They also agree that, if we find such an abuse, we may order a new trial only if the mistake "constituted significant prejudice so as to have denied the appellant a fair trial."[37]

(35)    Because the trial court did not abuse its discretion, we affirm its ruling and deny Plaintiffs' request for a new trial.  However, we emphasize that this is a difficult case, and Defendants squeak by a narrow margin.  A lot of time and resources could have been spared had the Defendants provided more thorough expert disclosures in compliance with the spirit—and not the mere letter—of Rules 16(e) and 26(e).

(36)    Indeed, "the requirement of a party to comply with discovery directed to identification of expert witnesses and disclosure of the substance of their expected opinion is a pre-condition to the admissibility of expert testimony at trial."[38]  As we said in *Barrow*

---

[37] *Barrow v. Abramowicz*, 931 A.2d 424, 429 (Del. 2007) (quoting *Green v. Alfred A.I. duPont Institute of the Nemours Foundation*, 759 A.2d 1060, 1063 (Del. 2000)) (internal quotation marks and citation omitted).

[38] *Bush v. HMO of Delaware, Inc.*, 702 A.2d 921, 923 (Del. 1997).

*v. Abramowicz*,[39] the Rules require "timely disclosure of [an expert's] opinions and the bases for his opinions" because, "[w]ithout this notice, the other party cannot properly prepare for trial."[40] Adherence to the disclosure rules is essential to a fair and efficient trial process.

(37) Plaintiffs' first specific argument on appeal is that the Superior Court abused its discretion in allowing Dr. Fifer to testify on whether Dr. West had complied with the informed-consent standard of care in his discussion with Mr. Phelps prior to Mr. Phelps' discharge. Even though Plaintiffs allege that Dr. West violated the standard of care by failing to inform Mr. Phelps of the reasons to remain in the hospital and the risks of leaving the hospital, Plaintiffs argue that Defendants cannot rebut their expert testimony on this issue because Defendants' disclosures did not state that Dr. Fifer would testify on this "informed consent" issue in particular.

(38) This Court has held that expert disclosures need not state "magic words" for an expert to be able to testify on a certain issue. In *Barriocanal v. Gibbs*,[41] in a slightly different context, this Court concluded that the trial court abused its discretion by barring an expert from testifying for failure to articulate certain "magic words." We said that such an approach would "exalt form over substance."[42] And, when determining whether expert

---

[39] 931 A.2d 424 (Del. 2007).

[40] *Id.* at 434.

[41] *Barriocanal v. Gibbs*, 697 A.2d 1169, 1172 (Del. 1997).

[42] *Id*. at 1172.

testimony was previously disclosed, this Court evaluates "the substance of the proffered testimony as a whole."[43]

(39)    Dr. Fifer's failure to utter "informed consent" should not preclude him from testifying consistently with his expert disclosure and his discovery deposition in this case. The trial court did not abuse its discretion in examining the substance of the prior disclosures and deposition testimony as a whole to determine whether it provided notice to the opposing party as to the sort of expert opinion that the witness would provide at trial.

(40)    Although not ideal, Dr. Fifer's disclosures and deposition testimony gave Plaintiffs adequate notice that he planned to testify on many issues relevant to the informed-consent standard of care and the basis of his opinions on these issues— supporting our view that the Superior Court did not abuse its discretion in determining, after "having looked through the entirety of Dr. Fifer's disclosure," that "it is fairly disclosed that [Dr. Fifer] intended to offer a decision as to the standard of care as to informed consent."[44]

(41)    For one, Defendants expressly provided in their disclosure that their experts "may address and/or rebut any testimony provided by Plaintiffs' experts."[45]  Further, Dr. Fifer's deposition testimony addressed the conversation that he would likely have with a

---

[43] *Id.* at 1173.

[44] Trial Tr., *supra* note 26, at B372.

[45] The Superior Court observed that it did not think "a blanket statement that your experts will respond or rebut the opinions of plaintiffs' expert is sufficient under 26(b)(4)," but noted that other language in the disclosures "does at least go to some of the issues in the informed consent issue." Pretrial Conf. Tr., *supra* note 23, at A64.

patient in Mr. Phelps' situation—a consideration relevant to whether Dr. West had complied with the informed consent standard.[46] When responding to Plaintiffs' counsel's question as to whether he would have recommended surgery before discharging Mr. Phelps from the hospital, Dr. Fifer said that he would "not necessarily" do so and then discussed the information that he would—or would not—provide to the patient before discharge.[47] When asked by Plaintiffs' counsel whether a doctor should inform a patient that indigestion can be a symptom of ischemia, Dr. Fifer said, "I don't think it's something that a doctor would be required to inform a patient of.  There are many, many things we can tell patients, I can't think of all of them.  I don't think that's one of the things that would come to mind."[48]  Dr. Fifer further stated that he would "not necessarily" warn a patient upon discharge to report to the hospital if he developed angina because "[t]here are too many variables" to consider.[49]

(42)    As the Superior Court summarized, "there was at least some deposition testimony regarding what the risks and benefits of discharge were, giving a patient the option to stay in the hospital and disclosing to a patient or advising a patient regarding certain symptoms and whether they should be flagged for a patient . . . ."[50]  Dr. Fifer's disputed trial testimony appears consistent with these disputed statements.[51]  Thus, the

---

[46] *See* Fifer Depo Tr., *supra* note 16, at B44-45, B49.

[47] *Id.* at B44.

[48] *Id.* at B49.

[49] *Id.*

[50] Trial Tr., *supra* note 26, at B373.

[51] *Id.* at B377, B420-21, B434, B436.

17

Superior Court did not abuse its discretion by allowing Dr. Fifer to provide consistent testimony relevant to informed consent and state at trial that he believed that Dr. West had complied with the standard of care.

(43) Plaintiffs' second argument on appeal is that the Superior Court abused its discretion by allowing expert opinion testimony that had not been disclosed in violation of Superior Court Civil Rules 16(e) and 26(e). They assert that the trial court's refusal to preclude the testimony in question rendered the expert witness disclosure requirement of Superior Court Rules 16(e) and 26(e) meaningless. In advancing this argument, Plaintiffs cite this Court's language in *Barrow v. Abramowicz*,[52] where we said that the trial judge's decision to admit previously undisclosed evidence "rendered the mandatory expert witness disclosure requirement of Superior Court Rules 16(e) and 26(e) meaningless,"[53] and was "highly prejudicial and denied [the plaintiffs] a fair trial."[54] Relying on the policy behind the disclosure rules, we stated in *Barrow* that "we cannot overlook the requirement that a defendant doctor wishing to so testify must give notice to an opposing party to give that party a fair opportunity to meet that 'expert' opinion on the same basis as any other expert opinion from a nonparty witness."[55]

(44) In *Barrow*, the defendants failed to disclose that the defendant doctor, Dr. Abramowicz, would testify as an "expert" in the case—not just as a fact witness—and give

---

[52] 931 A.2d 424 (Del. 2007).

[53] *Id.* at 435.

[54] *Id.*

[55] *Id.* at 433.

18

an opinion on an ultimate issue in the case. The trial judge allowed Dr. Abramowicz to testify that, even if there were cancer in the deceased's left upper lobe, "a failure to so report could not have produced a timely, lifesaving diagnosis and treatment plan."[56] But, given that the defendants never identified the doctor as an expert witness, the plaintiffs were deprived of the opportunity to respond with an expert of their own on the same issue. Moreover, we noted that "[t]he significance of Dr. Abramowicz's noncompliance is enhanced because his pretrial testimony on the underlying causation issue contradicted his trial testimony."[57]

(45) We again emphasize the importance of complying with the disclosure rules, but nonetheless observe that *Barrow* is distinguishable from the facts in this case. In *Barrow*, the lack of notice that Dr. Abramowicz would testify as an expert—and do so on the issue of causation—left the plaintiffs without *any* expert to rebut Dr. Abramowicz's testimony. Here, Defendants timely identified Dr. Fifer as their standard of care expert, and the jury was able to consider evidence from both parties given that Plaintiffs had their own standard of care expert. Moreover, Plaintiffs' deposition of Dr. Fifer revealed at least some of his opinions concerning Dr. West's compliance with the informed-consent standard of care. According to the trial court, "there was at least some deposition testimony regarding what the risks and benefits of discharge were, giving a patient the option to stay in the hospital and disclosing to a patient or advising a patient regarding certain symptoms

---

[56] *Id.* at 434.

[57] *Id.*

and whether they should be flagged for a patient . . . ."[58] Further, Defendants' disclosures provided that Dr. Fifer "may address and/or rebut any testimony provided by Plaintiffs' experts." Thus, the disclosure statement and deposition together gave Plaintiffs notice that Dr. Fifer would testify as an expert and would be prepared to respond to questions concerning the issue of informed consent—in contrast to *Barrow*, where there was no such warning.

(46) Further, unlike Dr. Abramowicz's testimony in *Barrow*, Dr. Fifer's trial testimony did not contradict his pretrial testimony. Dr. Fifer's testimony at trial that "there was no requirement[ ] to keep the patient in the hospital and that Dr. West fulfilled all of the standard of care requirements"[59] was consistent with Defendants' disclosures that stated that "[i]t is Dr. Fifer's opinion that Dr. West complied with the applicable standards of care at all times hereto."[60]

NOW, THEREFORE, IT IS HEREBY ORDERED that the judgment of the Superior Court be, and the same is hereby, AFFIRMED.

BY THE COURT:

*/s/ Karen L. Valihura*
Justice

---

[58] Trial Tr., *supra* note 26, at B373.

[59] *Id.* at B377.

[60] Defendants' Expert Disclosure, at A103.